IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

UNITED STATES OF AMERICA,

v.

ANDREW C. HOLT
AMANDA J. COSGROVE
MATTHEW L. BLACK

CASE NO.: CR508-16

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Amanda Cosgrove ("Cosgrove") is charged with: armed bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (d); Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and brandishing firearm during commission of a bank robbery, in violation of 18 U.S.C. § 924(c). Cosgrove filed a Motion to Suppress by which she seeks the exclusion of any statements she made in violation of Jackson v. Denno, 378 U.S. 368 (1964). The undersigned conducted an evidentiary hearing on March 3, 2009, at which Steven Chammoun ("Chammoun") and Kyle Salter ("Salter"), detectives with the Valdosta, Georgia, Police Department, and Cosgrove testified. Based on the following, Cosgrove's Motion should be **DENIED**.

## **FINDINGS OF FACT**

The credible testimony at the evidentiary hearing[1] and a review of the recorded interview of Cosgrove established the following:

On June 2, 2008, members of the Valdosta Police Department arrived at 1817 Northside Drive in Valdosta, Georgia, after receiving information about a kidnapping. Cosgrove and her friend, Jason Pere, then arrived at the scene. Emergency workers were on the scene. Cosgrove told Chammoun that she is a diabetic. Cosgrove was taken to the Valdosta Police Department and interviewed based on the police officers' belief at the time that she was the victim of a kidnapping and extortion plot. Cosgrove began speaking with Detective Chammoun around 12:15 p.m. Cosgrove carried a bottle of water into the interview room with her and had the water bottle at her immediate disposal throughout the first portion of this interview. Chammoun told Cosgrove that, if she needed anything, to stop him to tell him. Chammoun testified that Cosgrove did not tell him she was experiencing any medical problems at the time she was taken into the interview room. Cosgrove and Chammoun were very conversational with each other and spoke about Cosgrove's husband, brother-in-law, and friends, her home remodeling projects, her husband's business, and her attendance at Valdosta State University. Approximately 30 minutes after the interview began, Chammoun looked into Cosgrove's purse and saw Cosgrove's diabetes medication and the needles

---

[1] An evidentiary hearing was conducted on Cosgrove's Motion to Suppress so that the undersigned could make credibility determinations and develop the facts of this case. Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1211 (11th Cir. 2003). "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). As the fact finder at the evidentiary hearing, the undersigned had the opportunity to observe the witnesses and their demeanors and to hear their testimony. Chammoun's and Salter's testimony was consistent with the events depicted on the recording of Cosgrove's interrogation.

she needed to administer her medication. (Cosgrove Interview, 1:46:10). Chammoun asked Cosgrove if she was alright, and she said she needed to use the restroom. (Id. at 1:47:08).

After Cosgrove went to the restroom, Chammoun was not in the interview room for approximately 50 minutes. Cosgrove was sitting alone in the interview room during that time, and she leaned forward and backward several times and rested her chin on her arms, which were folded and on the table. When Chammoun again entered the interview room, he asked Cosgrove how she was doing. She replied that she was doing okay as she raised her head off her arms. Chammoun informed Cosgrove that he had received some information about the day's events that was different than what she told him and that he was going to have to handcuff her to the wall. (Id. at 2:43:16-2:43:36). Chammoun took Cosgrove's purse off of the table, which she had in her possession the entire time up to that point, and told her he knew her diabetes medication was in her purse. Chammoun asked Cosgrove if she was under the influence of any mind-altering drugs, and she said she was not. Chammoun read Cosgrove, who has had two (2) years of college education, her Miranda rights from a piece of paper while Cosgrove seemed to read along with him. After each enumerated right, Chammoun asked Cosgrove if she understood that right and told her to place her initials next to each right to indicate she understood that right. Chammoun read the waiver portion contained on the paper, and he explained to Cosgrove that it was up to her to sign the waiver portion. (Id. at 2:49:23). Cosgrove signed the paper.

Cosgrove told Chammoun that events happened that morning the way she said they had, but there were details involved that she omitted. (Id. at 2:55:09). Chammoun

told Cosgrove he knew she was lying to him, and she said, "I just didn't give you all of the details." (Id. at 3:15:30). Chammoun asked Cosgrove if she was doing okay and if she understood what was going on at the time; she said yes. (Id. at 3:23:27). Chammoun left the interview room again, and he testified that it was a practice at the Valdosta Police Department to leave an interview room so that the detectives could check witnesses' accounts against each other. Chammoun placed Cosgrove's purse (with her diabetes medication) on the chair in which he had been sitting. (Id. at 3:23:54).

When he returned to the interview room, Chammoun asked Cosgrove if she was doing okay, and she said "uh-huh" as she nodded her head yes. (Id. at 3:33:20). Chammoun told Cosgrove that he could not threaten her or promise her anything, but he would tell the District Attorney or the judge that she was being honest with him and that her honesty could go a long way. (Id. at 3:35:40). Chammoun and Cosgrove spoke for several minutes, and Cosgrove referred back to an earlier part of their conversation about other plans she and her alleged co-conspirators discussed. (Id. at 3:42:02). Chammoun told Cosgrove he hoped she was being honest with him. Chammoun left the interview room and told Cosgrove to keep thinking. (Id. at 3:49:03).

Salter entered the interview room less than 25 minutes later. Salter asked Cosgrove if she had been read her Miranda rights and whether she remembered what those rights were. She indicated she did. However, Salter read Cosgrove her Miranda rights again and asked her if she understood those rights and if she would be willing to speak to him. (Id. at 4:12:21). Salter told Cosgrove this was her one chance to be honest with him, and he also told her that, if she was going to lie to him to tell him she

did not want to talk with him and he would leave. (Id. at 4:17:26, 4:24:16). Cosgrove spoke to Salter. Twenty minutes later, Salter asked Cosgrove if she needed to use the restroom or anything to drink or anything at all, and she stated she needed to go to the restroom. Salter asked Cosgrove if she needed anything medically due to her diabetes. Cosgrove said she thought she was okay. Salter told her to let him or someone else know if she needed anything. (Id. at 4:44:25).

Chammoun testified at the evidentiary hearing that Cosgrove never indicated she had problems understanding what he said after she was placed under arrest or what she was saying to him. Chammoun also testified that Cosgrove never told him she could not remember things except for when she "forgot" to tell him certain details at the time she was still considered a victim. Chammoun also testified that Cosgrove never told him she needed medical attention, never put her head on the table in front of him, and did not tell him she couldn't remember her name, where she was, or her actions that day.

Salter testified that Cosgrove never indicated she had a faulty memory or could not remember anything about the morning and did not put her head down on the table. In fact, Salter testified that Cosgrove answered his questions and provided details he did not have prior to the time he interviewed her. Salter also testified that he has had first aid training, and that he thought someone suffering from a diabetic blackout exhibits symptoms similar to a person who is intoxicated and that he did not see any of that behavior with Cosgrove.

## ISSUE PRESENTED

Cosgrove contends the statements she provided to Chammoun and Salter should be suppressed because, at the time she provided these statements, she was suffering from a diabetic blackout, which rendered her unable to control what she said or to remember what happened after she was arrested. Cosgrove asserts her statements were not freely and voluntarily given.

## DISCUSSION AND CITATION TO AUTHORITY

**I.   Cosgrove's Assertion that her Statements Should be Suppressed.**

"No person . . . shall be compelled in any criminal case to be a witness against [her]self[.]" U.S. CONST. amend. V. "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards[2] effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way." Id. The circumstances of each case dictate "whether there is a restraint on the suspect's freedom of movement 'of the degree associated with a formal arrest.'" United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987) (quoting Minnesota v. Murphy, 465 U.S. 420, 430 (1984)). An objective, reasonable person test has been adopted "in cases involving custody issues." Id. at 1359. In applying this test,

---

[2] "Prior to any questioning, the person must be warned that [s]he has a right to remain silent, that any statement [s]he does make may be used as evidence against [her], and that [s]he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444.

"the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood [the] situation." Id. at 1360. In other words, the inquiry is whether "a reasonable [person] in the suspect's position would feel a restraint on [her] freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that [s]he would not feel free to leave" the scene. Id. (quoting Murphy, 465 U.S. at 430).

There is no question Cosgrove was under arrest at the time she provided inculpatory statements to Detectives Chammoun and Salter. Cosgrove was handcuffed to the wall of the interview room. There is also no question that both Chammoun and Salter advised Cosgrove of her Miranda rights. The question remaining before the Court is whether Cosgrove's statements to Chammoun and Salter were given voluntarily.

## II. The Voluntariness of Cosgrove's Statement.

The United States Supreme Court's holding in Jackson v. Denno, 378 U.S. 368 (1964), governs the voluntariness of confessions, and in pertinent part provides:

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if [her] conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction.

378 U.S. at 376 (internal citation omitted). A confession is not "voluntary" pursuant to the Due Process Clause when law enforcement officials have used coercive conduct. Colorado v. Connelly, 479 U.S. 157, 167 (1986). Coercion can be mental or physical. Blackburn v. Alabama, 361 U.S. 199, 206 (1960); Chambers v. Florida, 309 U.S. 227, 237 (1940). The test for determining if a confession is the result of coercion requires a

review of the "totality of the circumstances." Blackburn, 361 U.S. at 206 (citing Fikes v. Alabama, 352 U.S. 191, 197 (1957)). In examining the totality of the circumstances[3], it must be determined whether "the statement is the product of the accused's free and rational choice." Harris v. Dugger, 874 F.2d 756, 761 (11th Cir. 1989). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005). Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment. However, "[a]bsent police conduct causally related to the confession, there is no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Id. at 1296.

The evidence before the Court indicates that Cosgrove's statements to Chammoun and Salter were the product of a "free and rational choice." Harris, 874 F.2d at 761. There is no evidence Chammoun or Salter coerced Cosgrove to speak to them, nor did these detectives promise Cosgrove anything, in an effort to induce her to speak to them. Chammoun and Salter both advised Cosgrove of her Miranda rights; she said she understood those rights and agreed to speak with both detectives. Both Chammoun and Salter were aware that Cosgrove is a diabetic, and they inquired about her well-being on more than one (1) occasion throughout the course of the two (2) hour

---

[3] These potential circumstances include not only the crucial element of police coercion, but the length of the interrogation, its location, and its continuity, and the defendant's maturity, education, physical condition, and mental health. These circumstances also include the failure of police to advise the defendant of her rights to remain silent and to have counsel present during custodial interrogation. Withrow v. Williams, 507 U.S. 680, 693-94 (1993) (internal citations omitted).

interrogation.[4] Cosgrove never indicated she needed help, and, in fact, Cosgrove told Chammoun and Salter she was doing okay and only that she needed to use the restroom. Cosgrove's purse, containing her diabetic medication supplies, was in the interview room with her, as was the bottled water she brought with her. Cosgrove told Chammoun she was in college at Valdosta State University and was studying nursing. Cosgrove never indicated she had trouble understanding what the detectives said to her or what she said to them. Accepting as true Cosgrove's contention that she was suffering from a diabetic blackout at the time she gave Chammoun and Salter statements, this does not weigh in favor of finding that Cosgrove's statements were not voluntarily given. A defendant's physical condition is but one factor to consider under the totality of circumstances. See Withrow, 507 U.S. at 693-94.

However, the undersigned does not give credence to Cosgrove's assertion that she was suffering from a diabetic blackout which rendered her unable to provide statements to police freely and voluntarily. The evidence before the Court contradicts Cosgrove's assertion, as does the testimony she provided at the evidentiary hearing. Cosgrove was just as conversational and responsive with Chammoun at the time she purportedly was having the blackout as she was when she spoke with him prior to her arrest. Once Cosgrove was aware that she was a suspect and Chammoun began interrogating her, Cosgrove provided details of crimes that her alleged co-conspirators did not provide. Cosgrove also remembered details she omitted from her statement she made as an apparent victim. Additionally, Cosgrove never put her head down on the

---

[4] The undersigned recognizes Cosgrove was in the interview room for more than four (4) hours, but Cosgrove was under arrest and entitled to constitutional protections for about one-half of that time. Additionally, Cosgrove does not assert she was suffering from a diabetic blackout at the time she was considered a victim of the kidnapping and extortion plot.

table in the presence of Chammoun or Salter—a fact Cosgrove readily admitted at the hearing. Cosgrove also admitted at the evidentiary hearing that the statement she made in her affidavit that she did not have food or water in the interview room was inaccurate. Further, Cosgrove testified that she can understand what is being said to her and have a conversation when she is having a diabetic blackout, which she somewhat contradicted by also stating a person having a diabetic blackout can say things she does not mean or understand. The undersigned does not find Cosgrove credible and discredits her testimony. See n.1, supra. There is no evidence before the Court that Cosgrove's statements were not the result of a free and rational choice.

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Defendant Amanda Cosgrove's Motion to Suppress seeking to exclude her statements made to police officers on June 2, 2008, be **DENIED**. The Government should be entitled to use Cosgrove's statements as evidence.

**SO REPORTED** and **RECOMMENDED**, this 20th day of March, 2009.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev. 8/82)

10